ECF CASE



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



| | | |
|---|---|---|
| CONNECTICUT FOOD ASSOCIATION, INC. CRYSTAL ROCK, LLC, M.W.E., INC., COSMOS, INC., HIGHLANDS BAR & GRILL, BOTTEGA, CHEZ FON FON, BOMBAY CORP., On Behalf Of Themselves And All Others Similarly Situated, | : : : : : | |
| Plaintiffs, | : | CIVIL ACTION NO: |
| VS. | : | |
| VISA U.S.A., INC., VISA INTERNATIONAL SERVICE ASSOCIATION, INC., MASTERCARD, INCORPORATED, MASTERCARD INTERNATIONAL, INC., JPMORGAN CHASE & CO., CHASE BANK USA, N.A., CITIGROUP, INC., CITICORP, CITIBANK, N.A., MBNA CORPORATION, MBNA AMERICA BANK, N.A., BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE BANK, | : : : : : : : : | CLASS ACTION COMPLAINT <u>JURY TRIAL DEMANDED</u> |
| Defendants. | : | |

Plaintiffs the Connecticut Food Association, Inc., Crystal Rock, LLC, M.W.E.,

Inc., Cosmos, Inc., Highlands Bar & Grill, Chez Fon Fon, Bottega, and Bombay

Corporation,  ("Plaintiffs") by their attorneys, on behalf of themselves and a class of

merchants ("the Class"), allege for their Complaint against Visa International Service

Association, Inc., Visa U.S.A. Inc., MasterCard Incorporated, MasterCard International

Incorporated, JPMorgan Chase & Co., Chase Bank USA, N.A., Citigroup, Inc., Citicorp,

Citibank, N.A., MBNA Corporation, MBNA America Bank, N.A., Bank of America

Corporation, Bank of America, NA, Capital One Financial Corporation, and Capital One

Bank, (collectively "Defendants"),[1] upon knowledge with respect to their own acts and

upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.        This is a class action arising out of Defendants' collusive practices in

setting the Interchange Fees they charge merchants for processing transactions made with

Visa and MasterCard credit cards and engaging in other anti-competitive conduct in

violation of the United States antitrust laws.

2.        Defendants Visa and MasterCard are consortiums of competitors that

are owned and operated by tens of thousands of member banks, including the Bank

Defendants.  Together, the Visa and MasterCard associations handle between 75 to 80

percent of the total volume of general purpose payment card transactions.  Visa's and

MasterCard's policies are set by their overlapping member banks who agree to abide by

their associations' by-laws and regulations.

3.        One of the policies uniformly imposed by Visa and MasterCard is a

variable system of Interchange Fees included as a standard element in contracts with Visa

and MasterCard member banks.  The Interchange Fee is an "access fee" that merchants

are required to pay through their "acquiring" banks to the cardholder's "issuing" banks as

a condition for accepting Visa and MasterCard payment cards.  Defendants have agreed,

_____

[1] Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Citigroup, Inc., Citicorp, Citibank, N.A., MBNA Corporation, MBNA America Bank, N.A., Bank of America Corporation, Bank of America, NA, Capital One Financial Corporation, and Capital One Bank are collectively referred to herein as the "Bank Defendants."

conspired and/or combined to set the Interchange Fees charged to merchants for each transaction made using a Visa or MasterCard credit card at supra-competitive levels.

4.     Since 1998, Visa and MasterCard have increased Interchange Fees at least ten times (four times within the past two years) in a coordinated and parallel manner.  These increases are not tied to transaction processing costs and risks, and discriminate between different classes of merchants based, in part, on the degree to which merchants need to accept general purpose payment cards.  Moreover, Defendants have structured the Interchange Fees in a way that results in merchants having to subsidize benefits offered by Visa and MasterCard member banks to attract cardholders.  As a result, as denounced by trade organizations, Interchange Fees have become one of largest business costs to merchants and can actually meet or exceed a merchant's profit margin on a transaction.

5.     In addition to fixing Interchange Fees, Defendants have imposed uniform rules and regulations, including a No-Surcharge Rule and an Honor All Cards Rule, designed to prevent market forces from acting as a restraint on Defendants' ability to charge supra-competitive Interchange Fees, and illegally tie and bundle together separate and distinct services that are included in the Interchange Fees charged to merchants.

6.     Defendants' conduct has had and continues to have the effect of harming competition by: (i) causing Plaintiffs and the Class to pay fixed and supra-competitive Interchange Fees for General Purpose Card Network Services; (ii) imposing uniform rules on Plaintiffs and the Class that prevent them from being able to avoid or negotiate lower Interchange Fees; and (iii) forcing Plaintiffs and the Class to purchase

separate and distinct services that Defendants have unlawfully tied and bundled together.
Defendants' actions constitute acts and conspiracies in restraint of trade, under Section 1
of the Sherman Act.

7.     Plaintiffs bring this action on behalf of a class of merchants that
operate millions of commercial businesses throughout the United States and accept Visa
and MasterCard products, including, but not limited to, credit cards as a form of payment,
and have been damaged by Defendants' wrongful conduct.  On behalf of the Class,
Plaintiffs seek declaratory and injunctive relief and damages to redress the alleged
violations of the federal antitrust laws.

## JURISDICTION AND VENUE

8.     This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C.
§ 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1,
and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  This Court has
jurisdiction of the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331,
1337, 2201, and 2202.

9.     Venue in the Southern District of New York is proper under 28 U.S.C.
§ 1391 and 15 U.S.C. §§ 15, 22 and 26.  Defendants transact business and are found in
this District.  Plaintiffs as well as tens of thousands of retail establishments who are
members of the putative Class conduct business in this District, accept Visa and
MasterCard credit cards, and are forced to pay Interchange Fees set by Defendants.  The
interstate trade and commerce involved and affected by the alleged violations of the
antitrust laws was and is carried out, in part, within this District.  The acts complained of
have had, and will have, substantial anticompetitive effects in this District.

### THE PARTIES

10.    Plaintiff Connecticut Food Association, Inc., ("CFA") is a Connecticut non-stock corporation with a principal place of business in Farmington, Connecticut. CFA is a statewide trade association that has represented the Connecticut food industry for over 60 years.  CFA's wide-ranging membership includes all of the major chains, as well as independent grocers, convenience stores, manufacturers, distributors, wholesalers, brokers and specialty food producers in Connecticut.  The mission of CFA is to assist, protect, foster and advance the interests of its members and consumers who shop at CFA members' retail stores.  CFA is empowered by its members and its Bylaws, through the action of its Board of Directors, to engage in any lawful activities which will advance the interests of its members.  CFA's members include merchants who market and distribute their merchandise throughout Connecticut and New York.  Most of the stores operated by CFA members accept Visa and/or MasterCard credit cards and therefore are forced to pay Interchange Fees set by Defendants and abide by the uniform rules imposed by Defendants, including the No-Surcharge Rule and the Honor All Cards Rule.  CFA and its members have been injured in their business and property as a result of the unlawful conduct herein alleged.

11.    Plaintiff Crystal Rock, LLC ("Crystal Rock"), is a Delaware limited liability company with its principal place of business in Watertown, Connecticut.  Crystal Rock markets and distributes natural spring water as well as coffee and other ancillary products to homes and offices throughout New England, New York, and New Jersey. Crystal Rock is the fourth largest home and office water distribution company in the United States.  In connection with its business, Crystal Rock accepts both Visa and

MasterCard credit cards and is forced to pay Interchange Fees set by Defendants and abide by the uniform rules imposed by Defendants, including the No-Surcharge Rule and the Honor All Cards Rule.   Crystal Rock has been injured in its business and property as a result of the unlawful conduct alleged herein.

12.     Plaintiff M.E.W., Inc. is an Alabama corporation with its principal place of business in Birmingham, Alabama.  M.E.W. operates a restaurant and in connection with this business accepts both Visa and MasterCard credit cards issued by Visa and MasterCard member banks, including the Bank Defendants.  M.E.W. is compelled to pay Interchange Fees collectively set by Defendants and must abide by the uniform rules imposed by Visa and MasterCard, including the No-Surcharge Rule and the Honor All Cards Rule.  M.E.W. has been injured in its business and property as a result of the unlawful conduct alleged herein.

13.     Plaintiff Cosmos, Inc. is an Alabama corporation with its principal place of business in Birmingham, Alabama.  Cosmos operates a restaurant and in connection with this business accepts both Visa and MasterCard credit cards issued by Visa and MasterCard member banks, including the Bank Defendants.  Cosmos is compelled to pay Interchange Fees collectively set by Defendants and must abide by the uniform rules imposed by Visa and MasterCard, including the No-Surcharge Rule and the Honor All Cards Rule.   Cosmos has been injured in its business and property as a result of the unlawful conduct alleged herein.

14.     Plaintiff Highlands Bar & Grill is an Alabama corporation with its principal place of business in Birmingham, Alabama.  Highlands operates a restaurant and in connection with this business accepts both Visa and MasterCard credit cards

issued by Visa and MasterCard member banks, including the Bank Defendants. Highlands is compelled to pay Interchange Fees collectively set by Defendants and must abide by the uniform rules imposed by Visa and MasterCard, including the No-Surcharge Rule and the Honor All Cards Rule. Highlands has been injured in its business and property as a result of the unlawful conduct alleged herein.

15.    Plaintiff Bottega is an Alabama corporation with its principal place of business in Birmingham, Alabama. Bottega operates a restaurant and in connection with this business accepts both Visa and MasterCard credit cards issued by Visa and MasterCard member banks, including the Bank Defendants. Bottega is compelled to pay Interchange Fees collectively set by Defendants and must abide by the uniform rules imposed by Visa and MasterCard, including the No-Surcharge Rule and the Honor All Cards Rule. Bottega has been injured in its business and property as a result of the unlawful conduct alleged herein.

16.    Plaintiff Chez Fon Fon is an Alabama corporation with its principal place of business in Birmingham, Alabama. Chez Fon Fon operates a restaurant and in connection with this business accepts both Visa and MasterCard credit cards issued by Visa and MasterCard member banks, including the Bank Defendants. Chez Fon Fon is compelled to pay Interchange Fees collectively set by Defendants and must abide by the uniform rules imposed by Visa and MasterCard, including the No-Surcharge Rule and the Honor All Cards Rule. Chez Fon Fon has been injured in its business and property as a result of the unlawful conduct alleged herein.

17.    Plaintiff Bombay Corp. is an Alabama corporation with its principal place of business in Birmingham, Alabama. Bombay operates a restaurant and in

connection with this business accepts both Visa and MasterCard credit cards issued by
Visa and MasterCard member banks, including the Bank Defendants.  Bombay is
compelled to pay Interchange Fees collectively set by Defendants and must abide by the
uniform rules imposed by Visa and MasterCard, including the No-Surcharge Rule and the
Honor All Cards Rule.  Bombay has been injured in its business and property as a result
of the unlawful conduct alleged herein.

18.    Defendant Visa International Service Association, Inc. ("Visa
International") is a non-stock Delaware membership corporation with its corporate
headquarters located in San Francisco, California.

19.    Visa U.S.A., Inc. ("Visa U.S.A.") is a non-stock Delaware
membership corporation with its corporate headquarters located in San Francisco,
California.

20.    Visa International and Visa U.S.A. (collectively referred to herein as
"Visa") are associations of independent banks and financial institutions.  Visa
International's members include approximately 21,000 banks.  Visa U.S.A. is the United
States operating division of Visa, whose members include approximately 14,000 banks.

21.    Defendant MasterCard Incorporated ("MasterCard Inc.") is a private
Delaware stock corporation, with its corporate headquarters located in Purchase, New
York.  MasterCard Inc.'s common stock is owned by the principal members of Defendant
MasterCard International Incorporated ("MasterCard International").

22.    Defendant MasterCard International is a non-stock, Delaware
membership corporation with its corporate headquarters located in Purchase, New York.

23.     MasterCard Inc. and MasterCard International (collectively referred to herein as "MasterCard") are associations of independent banks and financial institutions. MasterCard International consists of more than 23,000 member banks worldwide and is the principal operating subsidiary of MasterCard Inc.

24.     Both Visa and MasterCard describe themselves as payment solutions organizations operating through their associated member banks (the "Associations"). Visa's and MasterCard's member banks issue Credit Cards to consumers and "acquire" merchants that accept Visa and MasterCard credit cards.

25.     On its website, Visa states that "Visa cards are the world's most widely used form of 'plastic' payment. As of December 2000, more than $1.8 trillion in products and services were purchased using Visa cards, and Visa's worldwide market share, at sixty percent, was greater than that of all other major payment cards combined."

26.     Similarly, a letter from MasterCard International's CEO included in the company's 2004 Annual Report stated that "people used MasterCard-branded cards for 16.7 billion transactions worldwide in 2004, an 11.4 percent increase over 2003. Purchase volume, the value of purchases made on our cards, grew to more than $1 trillion, a 12.4 percent increase over 2003."

27.     Visa and MasterCard, in conjunction with their member banks, are responsible for fixing Interchange Fees within each of their respective processing networks and between the two networks.  Visa and MasterCard, in conjunction with their member banks, are also responsible for imposing uniform rules on merchants that accept Visa and MasterCard credit cards and the bundling of separate and distinct services included in the Interchange Fees charged.

28.     Defendant JPMorgan Chase & Co., is a banking and financial holding company organized under the laws of Delaware with its principal place of business in New York, New York.  Defendant Chase Bank USA, N.A., a national banking association with its principal place of business in New York, New York, is a subsidiary of JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and Chase Bank USA, are referred to collectively herein as "Chase."

29.     Chase is a member of both Visa and MasterCard.  It engages in interstate commerce. It is and/or has been represented on the Visa Board of Directors.  It has had actual knowledge of and has knowingly participated in, the conspiracy to collectively fix Credit Card Interchange Fees.

30.     Defendant Citigroup, Inc. is a banking and financial holding company organized under the laws of Delaware, with its principal place of business in New York, New York.  Defendants Citibank N.A., a national banking association with its principal place of business in New York, New York, and Citicorp, a Delaware corporation with its principal place of business in New York, New York, are subsidiaries of Citigroup Inc. Defendants Citigroup, Inc., Citibank N.A., and Citicorp, are collectively referred to herein as "Citigroup."

31.     Citigroup is a member of both Visa and MasterCard.  It engages in interstate commerce.  It has had actual knowledge of, and had knowingly participated in, the conspiracy to collectively fix Credit Card Interchange Fees.    It has had actual knowledge of, and has knowingly participated in, the conspiracy to collectively fix Credit Card Interchange Fees.

32.     Defendant Bank of America Corporation is a banking and financial holding company organized under the laws of Delaware, with its principal place of business in Charlotte, North, Carolina. Defendant Bank of America, N.A., a national banking association with its principal place of business in Charlotte, North Carolina is a subsidiary of Bank of America Corporation. Defendants Bank of America Corporation and Bank of America, N.A. are collectively referred to as "Bank of America."

33.     Bank of America is a member of both Visa and MasterCard. It engages in interstate commerce. It is and/or has been represented on the Visa Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracy to collectively fix Credit Card Interchange Fees.

34.     Defendant MBNA Corporation is a banking and financial holding company organized under the laws of Maryland with its principal place of business in Wilmington, Delaware. Defendant MBNA America Bank, N.A. a national banking association with its principal place of business in Wilmington, Delaware, is a subsidiary of MBNA Corporation. MBNA Corporation and MBNA America Bank, N.A. are referred to collectively herein as "MBNA."

35.     MBNA is a member of both Visa and MasterCard. It engages in interstate commerce. It is and/or has been represented on the MasterCard Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracy to collectively fix Credit Card Interchange Fees.

36.     Defendant Capital One Financial Corporation is a banking and financial holding company organized under the laws of Delaware with its principal place of business in McLean, Virginia. Defendant Capital One Bank, a Virginia bank with its

principal place of business in Glen Allen, Virginia is a wholly-owned subsidiary of Capital One Financial Corporation. Capital One Financial Corporation and Capital One Bank are collectively referred to as "Capital One."

37.    Capital One is a member of both Visa and MasterCard. It engages in interstate commerce. It is and/or has been represented on the MasterCard Board of Directors. It has had actual knowledge of, and has knowingly participated in, the conspiracy to collectively fix Credit Card Interchange Fees.

38.    The Bank Defendants are potential competitors for the issuance of Credit Cards and acquisition of merchants. Each of the Bank Defendants belongs to both networks and has conspired with each other, with Visa and MasterCard member banks and with the Visa and MasterCard Associations to fix the level of Interchange Fees. Many of the Bank Defendants are, or were during the relevant time period, represented on the Visa and/or MasterCard Boards of Directors at the times when they collectively-fixed Interchange Fees. Each of the Bank Defendants had actual knowledge of the conspiracy to fix Interchange Fees and participated in and consciously committed themselves to the conspiracy to collectively fix Credit Card and Interchange Fees.

39.    The Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, are therefore directly responsible of fixing Interchange Fees within each network and between the two networks. The Bank Defendants, acting by and through the Boards of Directors of Visa and MasterCard, are also responsible for the tying of separate and distinct services to the Interchange Fee. Collectively, the Bank Defendants, through their operation of Visa and MasterCard, adopted and approved the above-mentioned policies and have significantly profited from those policies.

## CONSPIRACY ALLEGATIONS

40.     Visa and MasterCard are both associations of banks and financial institutions that are actual or potential competitors for (a) the issuance of General Purpose Payment Cards and (b) the provision of General Purpose Network Services related to General Purpose Payment Cards, including but not limited to, acquisition of credit card transactions, the development and maintenance of various payment technologies and financial services related to the processing and accounting of credit card transactions.  As members of Visa and MasterCard, the banks and financial institutions jointly and collectively formulate policies that (1) set minimum Interchange Fees and (2) restrain merchant conduct in order to protect the collusively set Interchange Fee from competitive market forces.

41.     Visa, MasterCard and the Bank Defendants have conspired with one another and each of the member banks to engage in a conscious scheme to fix Interchange Fees and to adopt and enforce rules and regulations complained of herein designed to prevent market forces from affecting Interchange Fees.  Visa, MasterCard, the Bank Defendants and their co-conspirators have significantly profited from those policies and practices.

42.     The actions of Defendants and their co-conspirators were all part of the same conspiracy to increase profits from Interchange Fees and suppress or eliminate competition.  Each Defendant and co-conspirator, with knowledge and intent, has agreed to the overall objectives of the conspiracy.  Further, each enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs and the other members of the Class.

43.     The conspiracy has been conducted, implemented and facilitated through various mechanisms, including direct communications between Defendants, sharing of information between Defendants, and the substantial overlapping membership between the Visa and MasterCard Associations.  Because their memberships are virtually identical, the Associations communicate frequently, exchange data, and coordinate much of their activity through joint programs, consciously parallel activity, and tacit collusion. Even absent explicit communications between Visa and MasterCard, banks, being members of both Associations, can and do easily pass information between the two Associations, in part through participation on the boards and committees of the two Associations.

44.     As a result of Defendants' conspiracy, Plaintiffs and other members of the Class have paid Interchange Fees that are higher than would have been absent the conspiracy.

45.     In the alternative, Visa and MasterCard are engaged in separate but parallel conspiracies, one involving Visa and its member banks and one involving MasterCard and its member banks.  The purpose and effect of each of these conspiracies is to increase profits from Interchange Fees and suppress or eliminate competition.  Each Defendant and member of each such conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy.  Further, each Defendant and member of each such conspiracy had enjoyed supra-competitive profits as a result of the conspiracy, to the detriment of Plaintiffs and the other members of the Class.

## CLASS ACTION ALLEGATIONS

46.     Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(1), (2) and (3), on behalf of a class consisting of all persons and business entities who have accepted Visa and/or MasterCard credit cards and, therefore, have been required to pay Interchange Fees set by Defendants, during the fullest period permitted by the applicable statutes of limitations (the "Class"). Excluded from the Class are Defendants, all of the officers, directors, and partners thereof, members of their immediate families and their legal representatives, heirs, successors or assigns.

47.     The members of the Class are so numerous that joinder of all members is impracticable as they number in the millions.

48.     Plaintiffs' claims are typical of the claims of the members of the Class as members of the Class are similarly affected by Defendants' uniform anticompetitive conduct alleged herein, which has caused the members of the Class to sustain a common antitrust injury.

49.     Plaintiffs will fairly and adequately protect the interest of the members of the Class and have retained counsel competent and experienced in complex class action litigation.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)     Whether Defendants and their co-conspirators illegally fix Interchange Fees for General Purpose Card Network Services;

b)      Whether Defendants and their co-conspirators illegally impose uniform rules that preclude Plaintiffs and the Class from avoiding or negotiating lower Interchange Fees;

c)      Whether Defendants and their co-conspirators illegally tie and bundle separate and distinct Network Credit Card Services;

d)      Whether Defendants' alleged price fixing and tying and bundling practices constitute *per se* or unreasonable violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; and

e)      To what extent have members of the Class sustained damages as a result of Defendants' anticompetitive practices and what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### DEFINITIONS

52.     The capitalized terms used in this Complaint have the following definitions:

a)      "Credit Card" means an access device, usually a payment card, enabling the holder to:  (i) effect transactions on credit for goods and services purchased, which are paid on behalf of the holder by the issuer of such device; or (ii) obtain cash

with credit extended by the issuer.  Examples of Credit Cards are the Visa and MasterCard Credit Cards issued by members of the Bank Defendants card networks. This definition does not include so-called "proprietary cards" of individual merchants that may only be used at the issuing merchant's place of business.

b)      "Premium Cards" refers to Credit Cards that offer rewards or other benefits to the cardholder and impose higher Interchange Fees on merchants than non-premium cards.

c)      "General Purpose Cards" collectively refers to all Credit Cards and Charge Cards.

d)      "Payment Card" refers to a plastic card that enables consumers to make purchases from merchants that accept the consumer's payment card (i.e. General Purpose Cards, debit cards, and merchant proprietary cards).

e)      "Network Services" means the services and infrastructure of data communications and transaction processing that Visa and MasterCard and their members provide to merchants through which payment transactions occur.  In particular, the network services enable the Visa and MasterCard Acquiring Banks to acquire payment transactions and to obtain authorization and payment from the Issuing Banks in the course of a purchase from a merchant.

f)      "Issuing Bank" means a member of Visa and/or MasterCard that issues Visa and/or MasterCard branded payment cards to consumers.  Issuing Banks compete with each other to attract cardholders.

g)      "Acquiring Bank" means a member of Visa and/or MasterCard that acquires payment transactions from merchants and acts as a liaison between the merchant and the bank card network to assist in processing the payment transaction. Typically, a customer presents a Visa or MasterCard card to a merchant for payment, the merchant forwards the transaction information to the Acquiring Bank which then contacts the Issuing Bank via the network for purchase approval based on available credit or funds. Acquiring Banks compete with each other for the right to acquire payment transactions from merchants.

h)      "Interchange Fee" in the General Purpose Card Network Services market means a fee that merchants pay to the Issuing Bank through the Acquiring Bank for each retail transaction where the Issuer's card is used as a payment device at one of the Acquirers retail store accounts.  The Interchange Fee is paid to the Issuing Bank through the Acquiring Bank by Class members, and constitutes a component of, and a floor for, the Merchant Discount Fee.

i)      "Merchant Discount Fee" means the fee paid by the merchant for Network Services for each transaction involving a Visa or MasterCard credit or off-line debit card (*i.e.*, the fee netted out and withheld from merchants when the Acquiring Bank credits the merchant's account for the amount of credit card charges).  The Merchant Discount Fee includes three components: the Interchange Fee, association fees, and an additional processing fee that the Acquiring Bank charges.  Over 90 per cent of the Merchant Discount Fee is comprised of Interchange Fees.

j)      "Payment Guarantee Services" refers to a form of insurance merchants can purchase that insures the merchant against Credit Card fraud, check fraud, and other forms of fraudulent payment.

## RELEVANT MARKETS

53.    A relevant market consists of a relevant geographic market and a relevant product market.

54.    There are at least two relevant product markets that have been adversely impacted by the anticompetitive conduct alleged in this Complaint:

a)      The General Purpose Card Market -- General purpose credit cards is the product dimension of this market. The geographic dimension of this market is the United States. *United States v. Visa*, 163 F. Supp. 2d 322, 339-40 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229, 239 (2d Cir. 2003).

b)      The General Purpose Card Network Services Market -- General Purpose Card Network Services is the product dimension of this market. The geographic dimension of this market is the United States. *Visa*, 163 F. Supp. 2d at 338.

55.    The only competitor to Visa and MasterCard to enter the General Purpose Card Network Services Market was Sears (Discover) in 1985, prior to the proliferation of electronic transaction systems.

56.    There are no equivalent competitors to either Visa or MasterCard currently existing in the United States. Visa and MasterCard, jointly and separately, have market power in the General Purpose Card Market and the General Purpose Card Network Services Market as demonstrated, *inter alia*, by: (i) as of 1999, Visa and

MasterCard respectively held a 47% and 26% share of General Purpose Card transactions in the United States by dollar volume; (ii) as of 1999, Visa and MasterCard collectively issued 85 per cent of the General Purpose Cards in the United States; (iii) Visa and MasterCard are able to raise Interchange Fees without losing merchants because "the cards are such preferred payment methods that customers would choose not to shop at merchants who do not accept them," *Visa*, 163 F. Supp. 2d at 340; and (iv) Visa and MasterCard are able to engage in price discrimination in setting the level of Interchange Fees charged to various classes of merchants based, in part, on the degree to which a class of merchants needs to accept General Purpose Cards. *Visa*, 163 F. Supp. 23d at 340.

## INTERSTATE COMMERCE

57.     Defendants are engaged in interstate commerce. The product markets identified above involve transactions that substantially affect interstate commerce and the conduct alleged to constitute a violation of the Sherman Act substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

### Background

58.     Visa and MasterCard market branded Payment Cards, which they license their member banks to issue to consumers who use them to purchase goods and services from merchants who have agreed to accept the cards as a method of payment. Visa and MasterCard then provide the networks over which these transactions are processed and impose and enforce rules governing the use of the networks and transaction processing. In essence, Visa and MasterCard operate electronic networks that

link Issuing and Acquiring banks and facilitate the processing of payment transactions between cardholders and merchants involving Visa and MasterCard branded payment cards.

59.    Over the course of the past forty years, Visa and MasterCard indisputably have developed market power in the General Purpose Card and General Purpose Card Network Services Market.

60.    Indeed, on its website, Visa USA boasts that its members use Visa's processing system "VisaNet, to facilitate more than $810 billion in annual transaction volume—including fifty-one percent of all Internet payments." Similarly, in its 2004 Form 10-K filed with the SEC, MasterCard represented that as of the end of 2004, there were 679.5 million MasterCard cards in circulation and that it processed more than 9.2 billion authorization requests in 2004 using its network.

**The Development Of Interchange Fees**

61.    When Visa's predecessor, BankAmericard,[2] was first introduced in the late 1950's, it performed both the issuing function (*i.e.*, issuing credit cards to consumers) and the acquiring function (*i.e.*, contracting with merchants to process transactions) for its Credit Card network. This resulted in payment transactions carried out using a three party system consisting of the consumer cardholder, the merchant, and BankAmericard, with BankAmericard setting and retaining the fees charged to both the consumers and the merchants.

---

[2] BankAmericard changed its name to Visa in 1977.

62.     Beginning in 1966, BankAmericard began to franchise the BankAmericard name to other banks that could issue Credit Cards and/or "acquire" merchants. This resulted in payment transactions being carried out using a four party system, consisting of the consumer cardholder, the Issuing Bank, the merchant, and the Acquiring Bank. Individual banks were allowed to determine the fees to be charged to cardholders and merchants. However, where the Issuing Bank and Acquiring Bank were different, BankAmericard required that the Acquiring Bank either pass the entire amount of fees charged to the merchant or the Acquiring Bank's average merchant fees on to the Issuing Bank.

63.     Then, in 1971, following BankAmericard's conversion into a membership corporation a year earlier, a variable system of Interchange Fees was established. Interchange Fees became a standard element of Visa's member banks' contracts that could not be negotiated separately between the member banks. MasterCard imposed the same standardized system of Interchange Fees on its member banks.

64.     The following example illustrates how Visa and MasterCard transactions are processed today and how Interchange Fees work: (a) a consumer (cardholder) presents a Visa or MasterCard card to purchase goods or services from a merchant; (b) the merchant sends the transaction details to the Acquiring Bank it has contracted with via the Visa or MasterCard network; (c) the Acquiring Bank forwards the transaction details to the Issuing Bank that issued the card via the Visa or MasterCard network; (d) the Issuing Bank authorizes payment and transfers the purchase amount to the Acquiring Bank, minus an Interchange Fee; (e) the Acquiring Bank pays the merchant

the purchase amount, minus the Interchange Fees and other fees, which together comprise the Merchant Discount Fee; and (f) the Issuing Bank debits the cardholder's account.

65.     The foregoing example involves three steps:  authorization, clearing and settlement, all of which occur through the networks of either Visa or MasterCard, depending on the type of card involved.  Authorization refers to the process by which the transaction is approved by the Issuing Bank.  Clearing refers to the exchange of financial information between the Issuing and Acquiring Banks.  Settlement refers to the exchange of the actual funds between the banks for the transaction and the associated fees.  As a result of the rules uniformly imposed by Defendants, Visa and MasterCard are at the center of the transaction process, maintaining the flow of financial information and funds between the Issuing Banks and Acquiring Banks through their respective networks.

66.     The Interchange Fee is the fee associated with exchange of transaction data between Acquiring Banks and Issuing Banks that is imposed on all transactions in accordance with Visa's and MasterCard's bylaws and rules.  Interchange Fees are charged on each transaction using the Visa and MasterCard networks, and are collectively set by Visa's and MasterCard's members, including the Bank Defendants. Although the Acquiring Bank nominally pays the Interchange Fee, Visa and MasterCard concede that Interchange Fees are passed through to the merchant.  Indeed, in its 2004 Form 10-K, MasterCard concedes that Interchange Fees are "a significant component of the costs that merchants pay to accept payment cards."

67.     When Interchange Fees began being imposed in the 1970s, they were justified as being necessary to cover the cost of the transactions being processed and to provide an incentive to the Issuing Banks to participate in the Credit Card networks.

Both of these were deemed necessary to existence of a nationally accepted credit card payment system.  Despite significant changes and technological developments in processing transactions and the ever increasing growth of Credit Cards as a method of payment that have taken place over the past twenty years, Visa and MasterCard have continued to impose nonnegotiable Interchange Fees on all Credit Card transactions and Interchange Fee rates have increased steadily.

### Duality And Its Impact On Fixing Interchange Fees

68.    Prior to 1970, Visa and MasterCard were comprised of and controlled by distinct groups of banks.  As a result, members of Visa did not issue MasterCard Credit Cards to their customers and vice versa.  This began to change in 1970, when Worthen Bank of Arkansas ("Worthen"), one of Visa's member banks, sought to become a card issuing member of MasterCard's network.  Although MasterCard did not object, Visa adopted a bylaw prohibiting its member banks from issuing any other networks' cards.  In 1971, Worthen filed a lawsuit in federal court challenging Visa's prohibition.

69.    In 1976, before the Worthen case was resolved, Visa amended its bylaws and began to allow its member banks to become issuing and acquiring members of MasterCard's network.  Likewise, MasterCard's rules allowed its member banks to become issuing and acquiring members of Visa's network.

70.    The ability of banks to become members of both Visa and MasterCard, and to issue both brands of Credit Cards became known as "duality."  Duality also allowed banks to "acquire" retail stores for both Visa and MasterCard.

71.     Today, the membership and ownership of the Visa and MasterCard networks are almost identical and there is currently more than a 95% overlap in the Associations' memberships.  Indeed, MasterCard's "Competitive Programs Policy" recognizes that Visa and MasterCard are "essentially owned by the same member entities."  Additionally, virtually every retail store that accepts Visa Credit Cards as a form of payment also accepts MasterCard Credit Cards and vice versa.

72.     Duality has facilitated the ability of Visa and MasterCard and the member banks belonging to both Associations to have free communications and to engage in concerted efforts in the promotion and operation of General Purpose Payment Cards including, but not limited to, collusive rate and fee setting of charges to consumers and merchants.

73.     In this regard, Visa and MasterCard are governed by  Boards of Directors elected by their respective member banks.  Although banks are prohibited from serving as member of the board of directors of both networks simultaneously, upon information and belief, all of the largest card-issuing banks have representatives on one of the Associations' boards of directors as well representation on important committees that influence policy for each network.  For example, MasterCard's Business Committee and Visa's Marketing Advisors Committee advise their respective networks' professional staff and management on key strategic and competitive issues.  As revealed in court filings by the Department of Justice, in 1996, twelve of the twenty-one banks represented on Visa's Board of Directors were also represented on MasterCard's Business Committee, and seven of the twenty-two banks represented on MasterCard's Board of Directors also were represented on Visa's Marketing Advisors Committee.  In total, as of

1996, approximately nineteen banks have had a representative on the board of directors of one association and on at least one important committee of the other association.

74.     Since the Network Services offered by Visa and MasterCard are virtually identical, they should be natural competitors. The condition of "duality" described above, however, has blunted competition in the market for General Purpose Card Network Services. This has led to uniformly fixed Interchange Fees for both Visa and MasterCard that rise in a coordinated and parallel manner.

75.     Visa and MasterCard, acting through their member banks (including the Bank Defendants), set uniform Interchange Fees to be imposed on merchants for Credit Card purchases among each of several classes of merchants. All Interchange Fees are fixed at the Visa and MasterCard network level -- the member banks are prohibited from independently negotiating Interchange Fees among themselves. Moreover, because of the 95% overlap of Visa and MasterCard membership, the banks (which include Acquiring Banks and Issuing banks) are collectively setting the Interchange Fees for both networks.

76.     Interchange Fees, in turn, account for over 90% of the Merchant Discount Fee. The Interchange Fee rate, therefore, sets the minimum amount of the Merchant Discount Fee. As a result, although MasterCard emphasizes on its website that it does not set Merchant Discount Fees, the Merchant Discount Fee is, in effect, uniformly fixed by Visa and MasterCard, acting through their member banks, including the Bank Defendants.

## HARMFUL EFFECTS ON COMPETITION

77.    Today, merchants have no choice but to accept Visa's and MasterCard's Credit Cards, as their market power is unrivaled for General Purpose Card Network Services. *Visa*, 163 F. Supp. 2d at 340.  Moreover, over the past twenty years, Credit Cards in general, and Visa and MasterCard in particular, have become an ever increasingly important payment method in this country.  For example, Credit Card payments as a percentage of total payments in the United States increased from approximately 3% in 1986 to approximately 25% in 2000.

78.    Merchants lose a percentage of their sales revenue by incurring the Interchange Fees described above.  As a result of the growing percentage of sales being paid for by Visa and MasterCard cards, Interchange Fees have become an increasingly large portion of merchants' costs of doing business.

79.    Moreover, Interchange Fees have risen dramatically over the past few years.  According to a recent report issued by Morgan Stanley, weighted average Interchange Fee rates rose from 1.58% in 1998 to 1.75% in 2004.  The same report forecast that weighted average Interchange Rates would reach 1.86% in 2010, a 17.7% rate increase from what they were in 1998.  According to the National Retail Federation, Interchange Fees can account for up to $2 of every $100 a shopper spends today.  With the growing use of Payments Cards, the dollar volume of Interchange Fees collected has grown from $9.4 billion in 1998 to $17.4 billion in 2004, and is projected to reach $32.4 billion in 2010.

80.    At its recent conference held on June 6-8, 2005, the Food Marketing Institute and the National Association of Grocers issued a position statement concerning

the rising costs of interchange fees (the "FMI/NAG position statement"). According to the FMI/NAG position statement, "interchange fees are an enormous - and growing - cost to retailers. Interchange fees have increased precipitously over the past few years even though interest rates are down, fraud is down and transaction volume is up." Despite decreasing costs related to maintenance of a network system, "the interchange fees continue to grow exponentially; with both rates and volume increasing, retailers will likely see an increase of more than 20 percent in costs in the next year."

81.     As noted above, Defendants previously have justified the non-negotiable Interchange Fees they charge as being necessary to the existence of a nationally accepted credit card payment system. Developments over the course of the past twenty years, however, have established this to be demonstrably false.

82.     Prior to the development of currently available electronic data processing and communication technology, Interchange Fees were said to be necessary to offset the costs of processing credit card transactions using paper records. During the early years of the Visa and MasterCard Associations, merchants that accepted Credit Cards made paper records of transactions, which were then passed to the merchant's Acquiring Bank and the consumer's Issuing Bank. Interchange Fees purportedly were devised as a mechanism to pay for the costs of transferring transactional paper from a merchant through its Acquiring Bank to the Issuing Bank and purportedly to balance network costs between the Issuing and Acquiring Banks.

83.     By the late-1980s, technology had evolved to the point that most transactions could be processed electronically, thereby eliminating the need for paper records for most payment card transactions. Additionally, because most transactions are

now processed electronically, Issuing Banks are more readily able to determine if a transaction is valid. As a result, the costs of processing Credit Card transactions and the risk of loss to the Issuing Banks have decreased substantially.

84. Likewise, Defendants' assertion that Interchange Fees are necessitated by their provision of Payment Guarantee Services is inadequate to justify their anti-competitive behavior. In this regard, when Visa and MasterCard fix the Interchange Fee, they include as part of the price a limited Payment Guarantee Service, which ensures that the merchant will be paid for a transaction if it has followed all Association rules, even if the cardholder never pays the outstanding balance.

85. This limited payment guarantee, however, only applies if the Issuing Bank, which is responsible for extending credit to the cardholder in the first instance, authorizes the particular transaction, and the merchant follows all applicable procedures set by the Associations. Under these circumstances, the Issuing Banks are in the best position to monitor and control costs related to non-payment for transactions that they have approved. By unilaterally increasing Interchange Fees based on the payment guarantee, Defendants are arbitrarily passing costs onto merchants that are properly borne by the Issuing Banks, including but not limited to the Bank Defendants.

86. Moreover, to the extent they are considered to provide a benefit to merchants, Payment Guarantee Services are distinct from transaction processing services. Nevertheless, Visa and MasterCard, acting through their member banks, collectively decide to set a fixed Interchange Fee that bundles together these distinct services. Because these services are bundled together, Interchange Fees, and thereby Merchant

Discount Fees, are higher than they would have been absent these collectively-established bundling practices.

87.    Defendants' tying and bundling of the fees for these separate and distinct services prevents merchants from purchasing these services from other companies or from self-insuring.  Plaintiffs and members of the Class suffer harm from the Defendants' bundling of these services in the form of Interchange Fees for the tied and bundled services that are set at a higher rate than if those services were offered separately.

88.    In short, despite the advancements in technology that have lowered the costs and risks of processing Credit Card transactions, Interchange Fees have not decreased as they should have in a competitive system and, in fact, have risen.  As a result, although advancements in technology have reduced acquiring costs, due to the increase in Interchange Fees, Merchant Discount Fees have risen.  Today, Interchange Fees can account for more than 2 percent of transactions.

89.    Accordingly, Interchange Fees are not rationally tied to costs, as they were originally purported to be.  Instead, they are used by Defendants to maximize profits by exploiting Visa's and MasterCard's market power.

90.    The additional justification that Interchange Fees are a necessary inducement to member banks to issue cards to cardholders is likewise no longer valid. Today, it is undisputed that Visa and MasterCard, jointly and severally, have market power in the market for General Purpose Card Network Services.  As a result, most merchants have no choice but to accept Visa and MasterCard Credit Cards because they are such a preferred method of payment.

91.     As a result of the prevalence of Visa and MasterCard brand cards as a payment method used by consumers, member banks now would find it in their interest to issue Visa and MasterCard payment cards, even without the promise of lucrative Interchange Fees.

92.     Moreover, today significant profit opportunities exist for banks on the issuing side of the business beyond Interchange Fees.  Issuing Banks make money through a variety of methods, including charging consumers membership fees, financing charges, late fees and other penalty fees, and offering credit insurance programs.  In this regard, a significant number of consumers regularly carry a balance on their Credit Cards and make partial monthly payments.  These consumers do not receive any "float" on their purchases and pay financing charges and/or other penalties every month.  In recent years, as Issuing Banks have engaged in aggressive marketing campaigns to attract cardholders, they have also implemented a number of policies that increase their ability to generate revenues, including increasing penalty fees, creating additional penalty fees (such as an over-the-limit fee), and offering cards with low introductory interest rates that escalate automatically or under certain circumstances, such as when a payment is made late.

93.     As a result of these and other developments, the credit card industry is more profitable than ever, and Issuing Banks (including the Bank Defendants) no longer require Interchange Fees as an incentive to issue cards to consumers.

94.     Also unfounded is Defendants' justification that fixed Interchange Fees are necessary because a decentralized system would be impracticable due to the number of banks and financial institutions that participate in the Associations.  In fact, due to the concentration and consolidation that has occurred in the banking industry, a

small number of member banks are involved in a majority of Visa and MasterCard transactions. As a result, absent Defendants' imposition of fixed Interchange Fees, a limited number of agreements between member banks could cover the processing of the vast majority of Credit Card transactions. Further, technological developments in communications systems and data processing make it possible for smaller banks to enter into processing agreements that would cover all of their transactions without having to enter into individual agreements with every other member bank.

95.      Accordingly, but for Defendants' fixing of Interchange Fees, banks could negotiate with one another over whether they would charge Interchange Fees and the amount of Interchange Fees to be charged, which would result in lower fees paid by merchants.

96.      In short, any possible necessity that may have once existed for non-negotiable Interchange Fees fixed by Defendants has dwindled if not vanished. Nevertheless, Interchange Fees have increased because of the absence of competitive pressure to reduce them. In fact, Visa and MasterCard compete for card issuing members by raising the Interchange Fees they allow the members to collect from merchants. As a result, over the years, Visa and MasterCard have engaged in a coordinated pattern of increasing Interchange Fees at the same time.

97.      Indeed, as noted in the FMI/NAG position statement: "Since 1998, Visa has increased its credit card interchange 10 times, including four increases in the last two years. MasterCard's increases have been almost identical, both in timing and amount. In most cases, these fees exceed and may even amount to twice the merchant's profit margin on the transaction. The United States has the highest credit card interchange

fees of any industrialized nation in the world and are roughly double what merchants must pay in the U.K. and E.U. and are more than three times the rates merchants pay in Australia; yet they should follow the opposite pattern due to our greater volume and economies of scale. In 2004, the weighted average for Visa and MasterCard interchange was 1.75 percent and is forecast to grow to 1.86 percent by 2010."

98.    Similarly, according to the National Association of Convenience Stores (the "NACS"), credit card fees are the fourth largest expense at the store level. At current rate increases, the NACS estimates that by 2020 credit card fees will approximate the cost of store rent. The largest component of credit card fees-Interchange Fees - account for roughly two-thirds of the fees charged to convenience stores.

99.    Most recently, both Visa and MasterCard increased their Interchange Fees effective April 1, 2005. The increases ranged from 2.7% on Visa Consumer Standard Credit transactions to 9% or more on typical retail purchases for MasterCard Corporate Face-to Face transactions.

100.    Defendants' collusive setting of Interchange Fees eliminates competition between banks for the rates that they charge merchants for the provision of General Purpose Card Network Services. Absent Defendants' conspiracy, both Issuing and Acquiring Banks could negotiate individually fees with retail merchants. Instead, as a result of Defendants' conduct, merchants, including Plaintiffs and members of the Class. are forced to pay supra-competitive Interchange Fees set by Defendants.

101.    Defendants have also implemented a variety of rules and regulations designed to prevent market forces from acting as a restraint on Defendants' ability to charge supra-competitive Interchange Fees. These rules and regulations prevent

merchants from taking steps to influence customers to use Visa and MasterCard cards that carry lower Interchange Fees or use other, less costly, forms of payments.

102.    For example, Visa and MasterCard rules uniformly prohibit merchants from imposing a surcharge on transactions made using any type of Visa or MasterCard card or to pass along any part of the fees the merchants are required to pay on these transactions (the "No Surcharge Rule"). Accordingly, merchants are prohibited from surcharging cardholders who use either a Visa or MasterCard card rather than another form of payment, a particular type of Visa or MasterCard card that carries a higher Interchange Fee, and/or a Visa card rather than a MasterCard card, or vice versa. This rule eliminates any incentive for banks or networks to charge a lower Interchange Fee than their competitors, because doing so will not allow merchants to try and steer consumers towards a particular payment method and will not result in increased usage of a particular type of card.

103.    The No Surcharge Rule is particularly injurious to merchants given the rising trend in the issuance of Premium Cards (i.e., cards that allow consumers to accumulate points that can be used to redeem airline tickets or other products). In recent years, Visa and MasterCard and their Issuing Banks (including the Bank Defendants) have successfully marketed Premium Cards to consumers and convinced them to use these cards more often in order to accumulate points to redeem their "rewards." In order to cover the cost of these additional benefits to cardholders, Visa and MasterCard impose increased Interchange Fees on merchants for transactions paid for using the Premium Cards. As a result, cardholders are encouraged to use Visa and MasterCard cards

carrying the highest Interchange Fees, with merchants subsidizing the additional benefits

the Premium cardholders receive.

104.    These costs must be completely absorbed by the merchants and/or

passed on to their overall customer base, irrespective of whether they are credit card

users. Nevertheless, because of the No Surcharge Rule, consumers have no way of

knowing the differing costs that merchants are forced to pay in connection with

transactions involving Visa and MasterCard Credit Cards, or the impact that they have on

retail prices.

105.    Similarly, Visa and MasterCard rules expressly require that merchants

must accept all Visa and Mastercard Credit Cards, regardless of the Interchange Fees

charged on the card or what bank issued the card, if the merchant accepts any Visa or

MasterCard Credit Card (the "Honor All Cards Rule").  As a result of this rule, merchants

are, once again, prohibited from taking steps to influence customers to use Visa and

MasterCard cards that carry lower Interchange Fees.  This rule further insulates Visa,

MasterCard and the Bank Defendants from market forces that otherwise would act as a

restraint on Defendants' ability to charge supra-competitive Interchange Fees.

106.    Additionally, Visa and MasterCard (in concert with the Bank

Defendants) prohibit merchants and member banks from by-passing the Visa or

MasterCard networks to clear, authorize or settle card transactions, even if the Issuing

and Acquiring Bank are the same.  This is in contrast to the rules in existence in the

1980s, which used to allow banks and merchants to bypass the Visa and MasterCard

system to process a transaction and did not charge Interchange Fees in situations where

the Issuing and Acquiring Bank were the same (known as "On-Us transactions").  In fact,

on February 15, 2005, Visa formally announced to it member banks that effective May 15, 2005, "all Visa requests and clearing and settlement records representing Visa transactions, including Member 'On-Us' transactions, must be processed through VisaNet."

107.    As a result, unlike the situation that existed in the 1980s, merchants have no choice but to incur Defendants' Interchange Fees on all transactions paid for using Visa and MasterCard Credit Cards.

108.    The foregoing rules which are uniformly imposed on merchants create a situation in which Visa and MasterCard Credit Card users are encouraged to use payment methods that are more costly to merchants, whose only recourse to try to recoup some of these costs is to pass some of the increased Interchange Fees on to their entire customer base.  Such anti-competitive conduct results in higher profits for Defendants and their co-conspirators at the expense of merchants and all consumers, including non-credit card users and low income consumers.

109.    The restraints on competition complained of herein are not reasonably necessary to Defendants' operations and, even if they were reasonably necessary, they are more restrictive than necessary to effectuate a nationally accepted Credit Card payment system.

110.    Indeed, regulatory authorities in the European Union, the United Kingdom, Spain and Australia have all determined that the Interchange Fees charged by Visa and/or MasterCard are, in one or more respects, anticompetitive and/or unjustifiably excessive.

## FIRST CLAIM FOR RELIEF
### (Unlawful Price Fixing of Interchange Fees By Defendants Visa, MasterCard and the Bank Defendants In Violation of Section 1 of the Sherman Act)

111.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

112.    Defendants Visa and MasterCard, the Bank Defendants and their co-conspirators have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

113.    Specifically, Defendants and their co-conspirators have entered into agreements the purpose and effect of which were to fix, raise, maintain or stabilize Credit Card Interchange fees set by Visa and MasterCard for General Purpose Card Network Services at similar supracompetitive levels, and have agreed not to reduce such Interchange Fees.

114.    Each of the Defendants has engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Defendants have carried out the above-described agreements by adopting, and abiding by rules and policies that set uniform Interchange Fees and imposing uniform rules that prevent merchants, including Plaintiffs and members of the Class, from avoiding these fees or negotiating lower fees.

115.    Defendants have substantial market power and have an incentive and the ability to maintain Interchange Fees at supra-competitive levels to protect their profits from competition from each other.

116.    Defendants' unlawful conspiracy constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, Defendants' conduct violates the Sherman Act under a rule of reason analysis.

117.    The aforesaid combination and conspiracy had the following effects, among others:

a)    Actual and potential competition in the General Purpose Card Network Services markets were substantially excluded, suppressed, and effectively foreclosed;

b)    Defendants acquired and maintained market power in the relevant markets;

c)    Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to merchants, including Plaintiffs and the Class, for General Purpose Card Network Services;

d)    All Class members were required to pay supracompetitive Interchange Fees for each of Defendants' General Purpose Card Network Services; and

e)    Defendants derived direct and substantial economic benefits from the supracompetitive Interchange Fees for their General Purpose Card Network Services.

118.    As a direct and proximate result of the contracts, combination or conspiracies alleged herein, Plaintiffs and other members of the Class were injured in their business or property in that they have been forced to pay higher Interchange fees for General Purpose Card Network Services than they would have paid in the absence of the Defendants' conduct.

## SECOND CLAIM FOR RELIEF
### (Unlawful Price Fixing of Interchange Fees By Defendants Visa and the Bank Defendants In Violation of Section 1 of the Sherman Act)

119.     Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

120.     Defendant Visa, the Bank Defendants and their co-conspirators have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

121.     Specifically, Visa, the Bank Defendants and their co-conspirators have entered into agreements the purpose and effect of which were to fix, raise, maintain or stabilize Credit Card Interchange fees set by Visa for General Purpose Card Network Services at similar supracompetitive levels, and have agreed not to reduce such Interchange Fees.

122.     Visa and the Bank Defendants have engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies.  Visa and the Bank Defendants have carried out the above-described agreements by adopting, and abiding by rules and policies that set uniform Interchange Fees for Visa transactions and imposing uniform rules that prevent merchants, including Plaintiffs and members of the Class, from avoiding these fees or negotiating lower fees.

123.     Visa and the Bank Defendants have substantial market power and have an incentive and the ability to maintain Interchange Fees at supra-competitive levels to protect their profits from competition.

124.    Visa's and the Bank Defendants' unlawful conduct constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S. C. § 1.  Alternatively, Visa's and the Bank Defendants' conduct violates the Sherman Act under a rule of reason analysis.

125.    The aforesaid combination and conspiracy had the following effects, among others:

a)      Actual and potential competition in the General Purpose Card Network Services markets were substantially excluded, suppressed, and effectively foreclosed;

b)      Visa and the Bank Defendants acquired and maintained market power in the relevant markets;

c)      Visa and the Bank Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to merchants, including Plaintiffs and the Class, for General Purpose Card Network Services;

d)      All Class members were required to pay supracompetitive Interchange Fees for Visa's General Purpose Card Network Services; and

e)      Visa and the Bank Defendants derived direct and substantial economic benefits from the supracompetitive Interchange Fees for General Purpose Card Network Services.

126.    As a direct and proximate result of the contracts, combination or conspiracies alleged herein, Plaintiffs and other members of the Class were injured in their business or property in that they have been forced to pay higher Interchange fees for

General Purpose Card Network Services than they would have paid in the absence of the Visa's and the Bank Defendants' conduct.

### THIRD CLAIM FOR RELIEF

**(Unlawful Price Fixing of Interchange Fees By Defendant MasterCard and the Bank Defendants In Violation of Section 1 of the Sherman Act)**

127.    Plaintiffs repeat and reallege the allegations contained above as if fully stated herein.

128.    Defendant MasterCard, the Bank Defendants and their co-conspirators have engaged in unlawful contracts, combinations or conspiracies in restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

129.    Specifically, MasterCard, the Bank Defendants and their co-conspirators have entered into agreements the purpose and effect of which were to fix, raise, maintain or stabilize Credit Card Interchange fees set by MasterCard for General Purpose Card Network at similar supracompetitive levels, and have agreed not to reduce such Interchange Fees.

130.    MasterCard and the Bank Defendants have engaged in one or more overt acts in furtherance of the unlawful contracts, combinations or conspiracies. MasterCard and the Bank Defendants have carried out the above-described agreements by adopting, and abiding by rules and policies that set uniform Interchange Fees for MasterCard transactions and imposing uniform rules that prevent merchants, including Plaintiffs and members of the Class, from avoiding these fees or negotiating lower fees.

131.     MasterCard and the Bank Defendants have substantial market power and have an incentive and the ability to maintain Interchange Fees at supra-competitive levels to protect their profits from competition.

132.     MasterCard's and the Bank Defendants' unlawful conduct constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S. C. § 1. Alternatively, MasterCard's and the Bank Defendants' conduct violates the Sherman Act under a rule of reason analysis.

133.     The aforesaid combination and conspiracy had the following effects, among others:

a)     Actual and potential competition in the General Purpose Card Network Services markets were substantially excluded, suppressed, and effectively foreclosed;

b)     MasterCard and the Bank Defendants acquired and maintained market power in the relevant markets;

c)     MasterCard and the Bank Defendants controlled, maintained, and elevated above competitive levels the Interchange Fees charged to merchants, including Plaintiffs and the Class, for General Purpose Card Network Services;

d)     All Class members were required to pay supracompetitive Interchange Fees for MasterCard's General Purpose Card Network Services; and

e)     MasterCard and the Bank Defendants derived direct and substantial economic benefits from the supracompetitive Interchange Fees for General Purpose Card Network Services.

134.   As a direct and proximate result of the contracts, combination or conspiracies alleged herein, Plaintiffs and other members of the Class were injured in their business or property in that they have been forced to pay higher Interchange fees for General Purpose Card Network Services than they would have paid in the absence of MasterCard's and the Bank Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays for a judgment against Defendants and for the following relief:

a)   Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Class, and designating their counsel as counsel for the Class;

b)   A declaration that Defendants have committed the violations alleged herein;

c)   A judgment against Defendants, jointly and severally, in an amount equal to treble the amount of damages suffered by Plaintiffs and the members of the Class as proven at trail, plus interest and attorneys' fees and expenses;

d)   An injunction preventing Defendants, their officers, directors, employees, agents, successors and members from engaging in future anti-competitive practices;

e)   Any such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: August 23, 2005

<div style="margin-left:40%">

**DRUBNER, HARTLEY & O'CONNOR, LLC**

By: _____

Charles S. Hellman (CH3208)
2 Penn Plaza
Suite 1500
New York, New York 10119
Tel. (212) 292-5665
Fax: (212) 629-4568

-and-

James E. Hartley, Jr.
Gary B. O'Connor
500 Chase Parkway
Waterbury, Connecticut 06708
Tel: (203) 753-9291
Fax: (203) 753-6373

**WHATLEY DRAKE LLC**

Joe R. Whatley
Richard Paul Rouco
2323 2nd Avenue North
Birmingham, AL 35203-2605
Tel: (205) 328-9576
Fax: (205) 328-9669

*Attorneys for Plaintiffs*

</div>